IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.: 19-cv-01350-MEH

JUDITH ALSIP,

      Plaintiff,

v.

CHARTER COMMUNICATIONS, INC.,

      Defendant.

_____

# ORDER

_____

**Michael E. Hegarty, United States Magistrate Judge**.

Before the Court are Plaintiff's Motion for Partial Summary Judgment (ECF 37) and Defendant's Motion for Summary Judgment (ECF 38). Plaintiff Judith Alsip ("Alsip") initiated this lawsuit on May 10, 2019, then filed the operative Amended Complaint on January 8, 2020, alleging three claims for relief: (1) sex discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"); (2) violation of the Equal Pay Act; and (3) retaliation in violation of Title VII. ECF 1, 29. Defendant Charter Communications, Inc. ("Charter") filed an Answer in response to the Complaint (ECF 32), then the parties proceeded with discovery. Alsip filed her motion on June 23, 2020 seeking summary judgment only as to Charter's liability for her retaliation claim, and Charter filed its motion on July 1, 2020, seeking summary judgment on all of Alsip's claims. The motions are fully briefed, no party seeks oral argument, and the Court finds further argument is unnecessary for adjudication of the parties' motions. For the following reasons, the Court will deny both motions.

## FINDINGS OF FACT

The Court makes the following findings of fact viewed in the light most favorable to the non-moving party, depending on which party has the burden of proof.  Unless otherwise cited, these facts are undisputed for purposes of the present motion.

1.      Alsip began working for Time Warner Cable ("Time Warner") in 2004.

2.      She worked in the digital phone space at Time Warner for approximately five years, and in 2009, she joined the engineering group as the Manager of Video-on-Demand ("VOD").

3.      David Cherryholmes was Alsip's supervisor from 2013, when Alsip's title was changed to Engineer, until January 2019.

4.      Alsip was an Engineer for approximately two years, until Cherryholmes promoted her to Senior Engineer and then, ultimately, to Manager in 2016.

5.      Alsip received a nine percent salary increase in connection with her 2016 promotion.

6.      Alsip considers Cherryholmes to have been a great manager and dedicated to his team, and she has great respect for his supervisor, Ken Sampson.

7.      Cherryholmes had an excellent business relationship with Alsip; he relied on her heavily for six years, which is why he promoted her twice and tried to promote her a third time.

8.      Starting in 2016, Time Warner Cable, Bright House Networks, and Charter/Spectrum were combined to form the current Charter Communications, Inc.

9.      In connection with the merger of the three companies, Alsip was offered the opportunity to relocate to Denver, Colorado to Charter's "Center of Excellence."  As indicated in the relocation offer, her title was going to change from "Manager, VOD Planning" to "Manager, Video Operations," and her salary was going to increase by twelve percent from $94,484.66 to $105,822.80 (with the same ten percent annual bonus).

10.    In contrast, with respect to Cherryholmes' transfer to Denver, he received one offer letter, which contained both the request to move and the offer of promotion.

11.    Alsip executed her Relocation Offer Letter before discussions began about reorganizing the team and potentially promoting Alsip to a Senior Manager.

12.    Alsip's relocation letter did not reflect any promotion offer because "[w]hen Judith's letter was created, there wasn't the intention for her to be a senior manager. So it wasn't reflected in that letter."

13.    As a result of the reorganization, Cherryholmes determined to seek a promotion of Alsip to Senior Manager effective upon her transfer to Denver in mid-2017, and Cherryholmes' supervisor, Sampson, approved Cherryholmes' request.

14.    Cherryholmes' intention had been to place a Senior Manager over VOD just as there was a Senior Manager over Switched Digital Video ("SDV").  Thus, James Stinson was slated for the role of Senior Manager over SDV making $135,000, and Alsip was slated for the position of Senior Manager over VOD.

15.    Alsip was a member of a team of eleven people and she was the only female on the team. All were verbally offered a promotion upon relocation to Denver, except Erik Patterson. All were promoted except Alsip and Patterson.

16.    Cherryholmes, Charter's designee for Plaintiff's Rule 30(b)(6) deposition, testified that the relocation/promotion process was "unlike anything else" he had "dealt with"; with respect to Alsip, he stated that her situation was "unique" in that she was told in advance of her promotion but "her offer letter did not contain language announcing her title adjustment, her new role" and she was listed on proposed organizational charts as a senior manager.  Rule 30(b)(6) Deposition of David Mark Cherryholmes ("Rule 30(b)(6) Dep.") 14: 4 – 15: 10.

17.     Alsip understood that the organizational chart circulated in late March 2017, reflecting her as a "Senior Manager," was a proposal as opposed to an actual structure in place.  Alsip appeared on all proposed organizational charts as a senior manager from March 2017—September 2017.

18.     Ultimately, as Alsip acknowledges, Sampson "simply overlooked some requests that he should have put in on Alsip's behalf," including a written promotion offer.

19.     Sampson wanted to give Alsip the promotion and, therefore, he tried to correct the mistake.

20.     Sampson submitted a Promotion Nomination Request on October 6, 2017 after he and his team, including Alsip, had relocated to Denver.

21.     In the request, Sampson proposed a ten percent salary increase, which was considered to be high because "promotions usually came with only around a five percent increase."

22.     Executive Vice President of Network Operations ("NetOps") Scott Weber must approve all promotion requests at Charter.

23.     Weber denied Sampson's request because "there was a policy in place that for one year after relocating to Denver, you could not have a promotion or a salary adjustment unless it was baked into the process, itself, through that offer letter."

24.     No Charter policy prevented Weber from fixing Sampson's "clerical error" of failing to "spin out a second offer letter."  Rule 30(b)(6) Dep. 32: 8-11; 49: 3-12.

25.     Alsip never met Weber and never had any direct communications with him of any sort.

26.     Alsip was aware of only one deviation from Weber's rule, which was in connection with filling a vacancy, not with creating a new position, as was true in her circumstance.

27.     Cherryholmes never promised Alsip that she would, in fact, be promoted; he never "promised an outcome," although he tried as hard as could to accomplish her promotion.

28.     Sampson was very apologetic when he conveyed to Alsip that the promotion request had been denied.

29.     While Cherryholmes agrees with Alsip that she was not treated fairly with respect to the promotion, he does not believe she was treated differently because she was a woman. Rather, he believes she was treated differently because "Ken Sampson forgot to spin out a second offer letter. We wouldn't be here if that happened."

30.     Cherryholmes spoke with Sampson approximately twelve times in an attempt to correct the mistake and achieve Alsip's promotion.

31.     Two female employees were promoted upon relocation.

32.     At the time of the relocation to Denver, an employee who worked for Bright House Networks, David Erik Patterson, requested "several times" from Sampson a promotion upon relocation, but Sampson denied his request because "there was no promotion available." Hearing Tr., July 23, 2020, 4: 11-20, ECF 47. Patterson believed, but was not sure, that his supervisor, Mark Ogletree, sought a promotion for Patterson upon the relocation. *Id.*, 5: 19-24. A Charter document dated on or about January 30, 2018 reflects Patterson's name on a list of "promotional recommendations." ECF 38-6, 39. The parties agree that Patterson's relocation was a lateral move.

33.     Cherryholmes and Alsip also tried to arrange a promotion for another employee, Jim Bannister, but that request was denied because he had not been in Denver for a year. Deposition of Judith Alsip, June 1, 2020 ("Alsip Dep."), 98: 16 – 99: 6, ECF 38-1.

34.     For a period of time, while Sampson's request for Alsip's promotion was making its way through the process, two managers reported to Alsip, Darrell Bynum and Phil Serrano ("direct reports"). Bynum began reporting to Alsip as early as June 2017.

35.     During the period August 2017 through February 2018, Stinson and Alsip carried out the same roles for different teams.  Rule 30(b)(6) Dep. 32: 14-20.

36.     Stinson previously reported to Alsip, but at the time of the reorganization, he was promoted to a senior manager. His salary was $135,000 and Alsip was paid $109,526.

37.     When Alsip's promotion was denied and it was clear that Cherryholmes' reorganization plan was not going to be adopted by Charter's executive management, Alsip's direct reports were removed in February 2018 and Cherryholmes became their manager.

38.     Sampson told Alsip on January 15, 2018 that Charter was going to remove "on paper" her direct reports, but he asked Alsip to continue doing the same job. Sampson explained that "sometimes things on paper are not what they really are."  Second Declaration of Judy Alsip, July 23, 2020 ("Alsip 2d Decl.") ¶ 4, ECF 46-1.  Alsip testified that her duties and responsibilities did not change throughout 2018.  *Id.*

39.     While Cherryholmes continued to use Alsip in a project management capacity, such that she continued to focus the team as a whole and supervised the team (including Bynum and Serrano) on a daily basis, she no longer handled her direct reports' annual reviews and she had no hiring and firing authority over them.  According to Cherryholmes, "in terms of what I needed out of [Alsip] and what I needed out of [Stinson], there was a lot of similarity even after the" direct reports were removed.  Rule 30(b)(6) Dep. 30: 14 – 31:1.

40.     Cherryholmes testified that Bynum and Serrano were "both wonderful employees" and never a "problem" for him.  *Id.* 31: 16-20.

41.     According to Charter, the key manner in which Stinson's and Alsip's duties differed after her direct reports were removed was that Cherryholmes held Stinson personally responsible for the performance of the managers that reported directly to Stinson, whereas he did not hold Alsip

to the "same standard of accountability." *Id.* at 30: 1-8.  This change in accountability was material because "accountability is something that Charter is extremely focused on."  *Id.* at 31:2-15.

42.     Alsip's workload decreased by three-to-four hours per year since she was no longer responsible for writing reviews and making personnel-type decisions for the direct reports.  *See* Alsip 2d Decl. ¶ 7.

43.     Alsip has been in Denver for more than two years but has received no promotion.  She spoke with Cherryholmes sometime after September 2018 when she expected to be submitted for promotion along with Bannister; Cherryholmes told her she was not submitted because "all this was going on," referring to the litigation.  Alsip 2d Decl. ¶ 8.

44.     Cherryholmes understood that, as of September 2018, there was no intention to create a Senior Manager for Video Operations.  Declaration of David Cherryholmes, August 7, 2020, ¶ 3.

45.     According to Alsip, Charter held her accountable as a senior manager in January 2019 when only she was given a corrective action for an error made by a team of engineers managed by both she and Serrano.  Alsip 2d Decl. ¶ 6.

46.     According to Charter, Alsip was given a "coaching" (not a corrective action) for the error because it was her team of engineers who failed to have an audit in place by which they could track the error, not Serrano's team.  Declaration of Fred Stoner, August 7, 2020 ("Stoner Decl.") ¶¶ 3-5, ECF 48-2.

47.     Alsip learned that both Bynum and Serrano made more money than she did when she was temporarily their direct manager, but Charter does not have a process by which it standardizes salaries upon acquisitions, such that salaries are dependent on factors such as location and the salaries Charter inherited from the legacy companies.

48.     In fact, Alsip has observed other instances in which subordinates have made more money than their managers.

49.     When Cherryholmes was supervising Stinson from approximately 2013 to 2015, Stinson, an engineer, made more money than Cherryholmes, his manager, largely due to the fact that his salary had been so high at the company from which he came prior to Time Warner.

50.     Alsip applied for a position as Senior Manager for Metadata with Charter in mid-January 2019. She was interviewed for that position twice and was orally offered the position on May 9, 2019 with a 10% salary increase.

51.     After she received the offer, Alsip told the person who hired her, Shannon Gay, that she was filing litigation against Charter, the result of which could "adjust [her] pay a bit."  Alsip Dep. 160: 2-6.

52.     The present lawsuit was filed the next day, on May 10, 2019.

53.     Charter, through its Senior Director for Video Products, Jon Shaver, rescinded the offer on May 16, 2019.  According to Alsip, Shaver told her "we . . . decided to go in a different direction" (Alsip dep. 162: 19-22, ECF 37-1) and "there was no longer a need for the position" (Declaration of Judy Alsip, June 19, 2020, ¶ 2).

54.     Shaver attests that he explained to Alsip the position had been open for over six months, and Charter's relationship with a video streaming provider who had been a key driver for the position materially changed.  Declaration of Jon Shaver, July 14, 2020 ("Shaver Decl."), ¶ 4.

55.     Cherryholmes attested that Charter rescinded the offer as follows:

> Q.     And did, then, Ms. Alsip talk about the litigation that she was going to be filing?
> A.     To the people that she was – in charge of the position she was applying to?
> Q.     Right.
> A.     My understanding is that she did bring that up.
> Q.     And that Charter then rescinded the offer?

> A.    It was rescinded after she brought that up.
> Q.    Do you know why it was rescinded?
> A.    Because of concerns of the impending legal action, and specifically that it could impact her compensation. So that's why it was rescinded.

Rule 30(b)(6) Dep. 41: 1-15.

56.    Alsip discovered months later, on December 3, 2019, that Charter had hired someone else to fill the same Senior Manager, Metadata position.

57.    Charter did not speak to Alsip about the position being reopened, and she was not offered the position.  In addition, although it was reposted, Alsip did not reapply.

58.    The position had changed into a "troubleshooting" role; the person hired for the position had extensive troubleshooting experience and had also worked for a vendor with whom the Senior Manager, Metadata would interface on a constant basis.

59.    Alsip does not believe that Cherryholmes ever intended to discriminate against her with respect to her pay or career progression.  As for Sampson, Alsip does not believe he intended to discriminate against her with respect to her pay but believes "it's more of a company culture." Alsip Dep. 40: 1-4.  In addition, Alsip did not believe "at first" that Sampson intended to discriminate against her with respect to her career progression:

> It wasn't until I started seeing a strong pattern of this across -- you know, a lot of these women all reported to Ken; they were up under Ken. So although I don't know that it was overt, I wonder if it was just sloppy, you know. Just -- you know, you just don't notice women. You know, you just – they'll take less, so you just don't think to give them more. So at first I didn't think so, but the more I see the pattern I wonder.

*Id.* 40: 9-22.

60.    Since January 2019, as a result of another reorganization, Alsip's supervisor has been Fred Stoner.

61.     In November 2019, Stoner issued Alsip a Corrective Action Report ("CAR") for failing to meet her on-call coverage expectations.

62.     Specifically, Alsip accepted an escalation (referred to as an "xMatter"), but then failed to ensure that the engineers were working on the issue which resulted in an extended outage impacting Charter's customers.

63.     It is Charter's policy to issue CARs when a self-inflicted outage occurs.

64.     The fact that Alsip accepted the xMatter is distinct from simply missing it, because there is an escalation ("roll-up") system in place to deal with missed calls.

65.     Alsip admits that she made a mistake.

66.     The two engineers who failed to address the xMatter were also written up.

67.     As for the two prior incidents that were noted in the CAR, it is standard practice at Charter to note such prior incidents.

## LEGAL STANDARDS

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). A court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (internal citations and quotation marks omitted).

It is the movant's burden to demonstrate that no genuine dispute of material fact exists for trial, whereas the nonmovant must set forth specific facts establishing a genuine issue for trial. *See*

*Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).  The moving party bears the initial responsibility of providing to the court the factual basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the moving party has the burden of proof—the plaintiff on a claim for relief or the defendant on an affirmative defense—his[, her, or its] showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party."  *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined.  *Celotex*, 477 U.S. at 322.  That is, the opposing party may not rest on the allegations contained in his complaint but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."); *see also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002).  These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'"  *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324); *see also Mountain Highlands, LLC v. Hendricks*, 616 F.3d 1167, 1170 (10th Cir. 2010) ("On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings  and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to [its] case in order to survive summary judgment.") (quoting *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)).

In considering the evidence, the court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165-66 (10th Cir. 2008). Further, the court may consider only admissible evidence, *see Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1541 (10th Cir. 1995), though the evidence need not be in a <u>form</u> that is admissible at trial; only the <u>content or</u> <u>substance</u> must be admissible at trial, *see Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) ("The requirement is that the party submitting the evidence show that it will be possible to put the information, the substance or content of the evidence, into an admissible form.") (citation omitted). Indeed, "[t]o determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury." *Argo v. Blue Cross & Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005); *see also Zia Shadows, L.L.C. v. City of Las Cruces*, 829 F.3d 1232, 1236 (10th Cir. 2016).

## <u>ANALYSIS</u>

The parties have filed cross motions with respect to Plaintiff's retaliation claim; accordingly, the Court will begin with an analysis of Claim Three, then proceed to examine whether summary judgment in Defendant's favor is proper as to Claims One and Two.

## I.    Claim for Retaliation in Violation of Title VII

To prevail on a Title VII retaliation claim, a plaintiff must establish that retaliation played a part in the employment decision, and she may satisfy this burden in two ways:

First, "the plaintiff may <u>directly</u> show that retaliatory animus played a 'motivating part' in the employment decision." *Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217, 1224–25 (10th Cir.

2008) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989) (plurality opinion), *superseded in part by* 42 U.S.C. §§ 2000e–2(m), 2000e–5(g)(2)(B)) (emphasis added). "[T]he plaintiff must demonstrate that the alleged retaliatory motive actually relates to the question of discrimination in the particular employment decision and may do so through the production of either direct or circumstantial evidence." *Id.* at 1226 (citation and internal quotation marks omitted); *accord Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011). Once the plaintiff proves that retaliatory animus was a motivating factor, the burden of persuasion shifts to the defendant to prove that it would have taken the same action absent the retaliatory motive. *Fye*, 516 F.3d at 1225.

Second, a plaintiff may prove her retaliation claim <u>indirectly</u> by invoking the following *McDonnell Douglas* framework: the plaintiff must first establish a prima facie case of retaliation by showing '(1) she engaged in protected opposition to Title VII discrimination; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action.'" *Id.* at 1227 (quoting *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1229 (10th Cir. 2004)). If the plaintiff makes a prima facie showing, the defendant must proffer a legitimate, nondiscriminatory reason for the adverse action. *See id.* Upon such proffer, the plaintiff has the burden of demonstrating that the defendant's asserted reasons for the adverse action are pretextual. *Id.*

Alsip argues that she has direct evidence of retaliation in the form of Cherryholmes' admission during the Rule 30(b)(6) deposition that Charter rescinded its offer of a promotion because of this litigation. Charter counters that Cherryholmes' testimony reveals a non-discriminatory reason for the rescission—"it was unknown how Alsip's lawsuit against the Company would impact her compensation." The Court finds that Cherryholmes' testimony is

13

sufficient to demonstrate a retaliatory motive in the decision to rescind the offer of promotion; he testified not only that Charter had "concerns about the impending litigation," but also that the litigation could "impact her compensation."  In this action in which Alsip alleges Charter failed to promote her even before the May 2019 offer and failed to compensate her for the same or similar work performed by male counterparts, a reasonable jury could find Charter's stated motivation for rescinding the Senior Manager offer was retaliatory.  *See Thomas v. Denny's, Inc.*, 111 F.3d 1506, 1512 (10th Cir. 1997) ("A plaintiff will be entitled to the burden-shifting analysis set out in *Price Waterhouse* upon presenting 'evidence of conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged [retaliatory] attitude.'") (citations omitted).

The burden now shifts to Charter "to prove that it would have taken the same action absent the retaliatory motive."  *Fye*, 516 F.3d at 1225.  Charter first argues that its concerns about the litigation were not retaliatory but, rather, based on budgetary "unknowns."  Resp. 4.  While Charter cites to its statement of facts for this position, Charter provides no evidence regarding any concern "that the business unit could not appropriately budget or plan for the future" given the "uncertainty" of the litigation.  *See id.*  The Court finds Charter fails to raise material factual issues as to whether it would have rescinded the Senior Manager offer based on any budgetary uncertainty.

Charter also proffers testimony from Jon Shaver, who attests that he advised Alsip on May 16, 2019 that Charter's "leadership" had decided to re-evaluate the position after discussions about potentially changing the role, and he explained to Alsip the position had been open for over six months and Charter's relationship with a video streaming provider, who had been a key driver for the position, materially changed.  Shaver Decl. at ¶ 4.  The Court concludes that a reasonable jury

14

could find this testimony to be true and may demonstrate that Charter would have rescinded the offer absent any retaliatory motive. *See Fogarty*, 523 F.3d at 1165-66 (in considering the evidence presented on summary judgment, a court cannot and does not weigh the evidence or determine the credibility of witnesses). Accordingly, the Court denies the motions seeking summary judgment on the retaliation claim and finds that Plaintiff is entitled to a mixed-motive instruction at trial.

## II.     Claim for Sex Discrimination in Violation of Title VII

When the proffered evidence is circumstantial, a claim for discrimination based on a failure to promote is subject to the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), under which a plaintiff has the initial burden of establishing a prima facie case. *Salemi v. Colorado Pub. Employees' Ret. Ass'n*, 747 F. App'x 675, 690 (10th Cir. 2018) (citing *Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003)). Under this framework, the plaintiff must demonstrate "(1) she was a member of a protected class; (2) she applied for and was qualified for the position; (3) despite being qualified she was rejected; and (4) after she was rejected, the position was filled [or remained open]." *Id.*; *see also Amro v. Boeing Co.*, 232 F.3d 790, 796 & n.2 (10th Cir.2000) (clarifying that the fourth prong does not require a showing that the position "was filled by someone outside the plaintiff's protected class"). If the plaintiff satisfies her initial burden, the burden shifts to the employer to "articulate a legitimate, nondiscriminatory reason for its employment action." *Id.* If the employer satisfies its burden, the burden shifts back to the plaintiff to demonstrate that the employer's reason is a pretext for discrimination. *Id.* A plaintiff may establish pretext by showing that the reason offered by the employer is "factually false" or by showing "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered reason, such that a reasonable fact finder could deem

the employer's reason unworthy of credence." *Id.* (quoting *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017) (quotation marks omitted)).

Here, Charter contends that Alsip fails to demonstrate she was treated less favorably than similarly situated male employees[1] and that Charter's stated non-discriminatory reason for the decision not to promote Alsip to a senior manager is pretext. Alsip counters that Charter's comparison of her circumstances to other male employees is unsupported and that the evidence demonstrates a question of whether Charter's reason is merely pretext for unlawful discrimination.

The Court finds Alsip demonstrates a prima facie case of a failure to promote based on gender pursuant to *McDonnell Douglas*. No party disputes that Alsip is a member of a protected class who was qualified and considered for a promotion, but Charter rejected the promotion. In addition, it is undisputed that Alsip was performing the work of a senior manager from approximately June 2017 to February 2018 when her direct reports were removed; Alsip also attests that, except for three-to-four hours, she continued to do the work of a senior manager throughout 2018. A reasonable jury could find that the position "remained open" and was being performed by Alsip. *See Reynolds v. Sch. Dist. No. 1, Denver, Colo.*, 69 F.3d 1523, 1535 (10th Cir. 1995) (finding that a position "left open" and "later eliminated entirely" did not defeat the plaintiff's prima facie case). Plaintiff's burden in this regard "is relatively light." *Godinet v. Mgmt. & Training Corp.*, 994 F. Supp. 1348, 1353 (D. Kan. 1998) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("what is required to establish the *McDonnell Douglas* prima facie case is infinitely less than what a directed verdict demands"); *see also Reynolds*, 69 F.3d at 1535 (ultimate question is whether plaintiff "was rejected under circumstances which give rise to

---

[1] Notably, the case Charter cites for the *McDonnell-Douglas* burden-shifting framework involved a Rule 12(b)(6) analysis of an alleged discriminatory termination and other "adverse" actions not including a failure to promote.

an inference of unlawful discrimination") (quoting *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

The burden now shifts to Charter to articulate a legitimate, nondiscriminatory reason for the rejection. Charter explains that Alsip was not promoted because, not only did Alsip's manager make a "clerical error" by failing to include the promotion offer in her relocation letter, but also the ultimate decisionmaker applied Charter's policy that no employee received a promotion until at least one year after they relocated to Denver. The Court finds Charter has met its burden to show a legitimate non-discriminatory reason for the decision not to promote Alsip. *See Ramirez v. The GEO Grp., Inc.*, 655 F. Supp. 2d 1170, 1178 (D. Colo. 2009) ("Like a plaintiff's burden to show a prima facie case, a defendant's burden here is 'exceedingly light.'") (quoting *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1173 (10th Cir. 2007)).

The burden shifts back to Alsip to raise a genuine issue (or issues) of material fact as to whether Charter's reason is actually a pretext for unlawful sex discrimination. Again, "[a] plaintiff can show pretext by revealing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action such that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reason." *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1059 (10th Cir. 2020) (quoting *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002)). In addition, pretext may be demonstrated "by providing direct evidence discrediting the proffered rationale, or by showing that the plaintiff was treated differently from others similarly situated." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015) (quotation omitted). However, "the evidence which a plaintiff can present in an attempt to establish that a defendant's stated reasons are pretextual may take a variety of forms," and "[a]

17

plaintiff may not be forced to pursue any particular means of demonstrating that a defendant's stated reasons are pretextual." *Frappied*, 966 F.3d at 1059 (quoting *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)). When reviewing for pretext, courts should be "mindful we must not sit as a superpersonnel department that second-guesses the company's business decisions, with the benefit of twenty-twenty hindsight." *Id.* (quoting *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 813-14 (10th Cir. 2000)).

Alsip asserts that she was the only female on a team of eleven, and she was the only person on that team who was promised a promotion but did not receive one. She also argues that Stinson, a similarly situated male employee, was promised a promotion by the same supervisor and received it. It is undisputed that Sampson prepared the proper paperwork for Stinson's promotion, but not for Alsip's. Charter counters first that Sampson's error was simply "clerical" and, second, that the ten remaining male employees on Alsip's team, nine were promoted and, like Alsip, Erik Patterson, a similarly situated male, also was "slated" for promotion but did not receive one for the same reason Alsip did not receive a promotion. Alsip replies that Patterson requested and was denied an opportunity for promotion prior to the relocation and he never appeared on any proposed organizational charts in a promoted position and, therefore, he is not similarly situated to Alsip.

Typically, a "similarly situated" employee shares the same supervisor, is subject to the same performance standards, and otherwise faces comparable "relevant employment circumstances." *Green v. New Mexico*, 420 F.3d 1189, 1194 (10th Cir. 2005) (quoting *Kendrick*, 220 F.3d at 1232; *see also Timmerman v. U.S. Bank*, N.A., 483 F.3d 1106, 1120 (10th Cir. 2007) ("Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline.") (quoting *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997)). Charter does not rebut that Stinson is a similarly

18

situated male who received a promised promotion.  Furthermore, it is undisputed that Charter did not ultimately award Alsip the senior manager position although, as she attests, she continued performing the work of a senior manager for more than a year after relocating to Denver, and Alsip was neither offered nor received any other promotion from February 2018 to November 2019 (at which time she received a corrective action).

With respect to Charter's contention that two similarly situated males also received no promotion, the Court finds the proffered evidence fails to establish that Patterson was similarly situated to Alsip for purposes of summary judgment; they worked for two different companies before the relocation, they had different supervisors, and, although Sampson apparently was in the chain of command for both Alsip and Patterson, he specifically denied Patterson's request for a promotion and supported Alsip's recommendation for a promotion.  Moreover, for approximately seven-to-eight months, two managers reported to Alsip, which Charter agrees is a responsibility of a senior manager, before the recommendation for promotion was rejected.  Alsip attests (and Cherryholmes agrees) that she continued to perform the same or similar work, with the exception of three-to-four hours of personnel paperwork and accountability for the two managers, even after the promotion was rejected.

In addition, contrary to Charter's contention, the evidence presented here does not establish that Alsip's and Patterson's rejections were based on the same reason.  Cherryholmes attested that Alsip's promotion was rejected based on a policy to wait one year after relocation before awarding a promotion, but the only evidence proffered for the reason Patterson was rejected is a listing of personnel recommendations on which both he and Alsip appear; the listing itself contains no "reason" for any denials (see ECF 39), but an email to which the listing was attached states denials were for "any individuals that received a large increase within the past year to relocate or

experienced a title change or promotion within the past year." ECF 38-6. As Alsip argues, this implies a different policy or practice that Charter's employees may not receive salary increases or be promoted more than once per year.

Charter also contends that Bannister is a similarly situated male employee who did not receive a promotion upon relocation to Denver. The Court disagrees that summary judgment is proper on this issue. Although Alsip testified that Bannister was not promoted based on Charter's policy to wait at least one year after relocation before awarding a promotion (Alsip Dep. 98: 16 – 99: 2), he was not a manager like Alsip and did not have the same duties and responsibilities. *See Green*, 420 F.3d at 1194. Under prevailing law, Alsip and Bannister were not similarly situated.

Further, the parties do not dispute that two female employees were promoted upon relocation to Denver; however, neither party provides sufficient information to permit the Court to determine whether these employees were similarly situated to Alsip or whether Sampson recommended or approved promotions for these women or for any others. *See* Alsip Dep. 60: 17 – 61: 2; *see also* Am. Compl. ¶11, ECF 29. Finally, Charter asserts that Alsip acknowledges Sampson's "clerical error" in failing to submit the proper paperwork for Alsip's promotion was an "oversight." But, consistent with that acknowledgment, Alsip attests that she saw a "strong pattern" with respect to Sampson and Charter as follows: "So although I don't know that it was overt, I wonder if it was just sloppy, you know. Just -- you know, you just don't notice women. You know, you just – they'll take less, so you just don't think to give them more." Alsip Dep. 40: 9-22. The Court finds that the evidence before it does not establish that Charter is entitled to summary judgment as a matter of law.

Therefore, the Court concludes that Alsip has demonstrated genuine issues of material fact as to whether Charter's stated reasons for not promoting her to a senior manager position—i.e.,

that the failure arose from a clerical error and that an employee must wait one year after relocation to Denver to receive a promotion—are pretextual.

## III.    Claim for Violation of the Equal Pay Act

Unlike Title VII claims, an adjudication of claims under the Equal Pay Act ("EPA") proceeds in two steps. "First, the plaintiff must establish a prima facie case of discrimination by demonstrating that employees of the opposite sex were paid differently for performing substantially equal work."   *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1311 (10th Cir. 2006) (citation omitted).   "Specifically, a prima facie case of discrimination under the EPA consists of proof that (1) the plaintiff was performing work which was substantially equal to that of employees of the opposite sex, taking into consideration the skills, duties, supervision, effort and responsibilities of the jobs; (2) the conditions where the work was performed were basically the same; (3) employees of the opposite sex were paid more under such circumstances."   *Id.* at 1311 n.5.

If a plaintiff establishes a prima facie case, the burden of persuasion then shifts to the defendant to prove that the wage disparity was justified by one of four permissible reasons.   *See id.* "These reasons are: (1) a seniority system; (2) a merit system; (3) a pay system based on quantity or quality of output; (4) a disparity based on any factor other than sex."   *Id.* (quoting *Tidwell v. Fort Howard Corp.*, 989 F.2d 406, 409 (10th Cir. 1993)).   "If the employer fails to convince the jury with its evidence of one or more of the 'affirmative defenses' . . . the plaintiff will prevail on her prima facie case."   *Id.* (internal quotations and citation omitted).   Because the employer's burden in an EPA case is "one of ultimate persuasion, 'in order to prevail at the summary judgment stage, the employer must prove at least one affirmative defense so clearly that

21

no rational jury could find to the contrary.'" *Id.* (quoting *Stanziale v. Jargowsky*, 200 F.3d 101, 107 (3d Cir. 2000)).

The Tenth Circuit "agrees" with the Third Circuit that the EPA's language "requires an employer to 'submit evidence from which a reasonable factfinder could conclude not merely that the employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons *do in fact* explain the wage disparity.'" *Id.* at 1312 (quoting *Stanziale*, 200 F.3d at 107–108) (emphasis in original). Thus, "where, as here, employers seek summary judgment as to [an] Equal Pay Act claim, they must produce sufficient evidence such that no rational jury could conclude but that the proffered reasons actually motivated the wage disparity of which the plaintiff complains." *Id.* (quoting *Stanziale*, 200 F.3d at 108).

Alsip alleges that Charter violated the EPA when it paid Stinson $25,473 more than Alsip for substantially the same work. Am. Compl. ¶¶ 22-24. No party disputes that, during the relevant time, Stinson was paid $135,000, while Alsip was paid $109,527. Charter contends that Stinson and Alsip were not performing "substantially equal" work because, unlike Stinson, when Alsip's direct reports were removed in February 2018, she "no longer had any accountability for other employees or their work, she did not have any responsibilities with respect to performance reviews, and she had no responsibilities with respect to personnel decisions, all of which Mr. Stinson did have." Mot. at 15. Charter also argues that the pay disparity arose from "factors other than sex," such as "geography and the legacy companies from which the employees came." *Id.*

Alsip counters that Cherryholmes agrees she was performing work substantially equal to Stinson, in that the only difference after her direct reports were removed in February 2018 was that she no longer had the responsibility to complete performance reviews or other personnel-based work for them, which she calculates as approximately three-to-four hours per year. In addition,

22

Alsip claims she was treated as a senior manager as late as January 2019 when only she was given a "corrective action" for a team error, although she supposedly "co-managed" the team with Serrano.   Finally, Alsip contends that Charter fails to demonstrate the affirmative defense of "factors other than sex" by failing to show that Stinson, in the past, made more than Alsip; in fact, according to Alsip, Stinson has never been paid more than Alsip until he received his promotion. Charter replies that Alsip's role changed substantially after her direct reports were removed in that she was no longer accountable for their actions and could no longer "hire or fire" them.   Charter also disputes that Alsip received a corrective action, saying she received a "coaching" because her team, as opposed to Serrano's, was responsible for failing to ensure an audit was in place, so that the company could identify the engineer who made an error resulting in a "self-inflicted outage." Further, Charter argues that the Tenth Circuit allows employers to rely on prior salary *plus* another factor to explain a disparity in wages, which Charter contends it has done here.

The Court finds Alsip has raised a genuine issue of material fact as to whether her work and Stinson's were "substantially equal."   Work is "substantially equal" for purposes of the EPA if it requires "equal skill, effort, and responsibility." *Riser v. QEP Energy*, e, 1196 (10th Cir. 2015) (citing 29 U.S.C. § 206(d)(1)).  "This determination turns on the actual content of the job—not mere job descriptions or titles."  *Id.*

> "What constitutes equal skill, equal effort, or equal responsibility cannot be precisely defined," but must take into consideration "the broad remedial purpose of the law." 29 C.F.R. § 1620.14. Thus, "[i]nsubstantial or minor differences in the degree or amount of skill, or effort, or responsibility required for the performance of jobs will not render the equal pay standard inapplicable." *Id.* That said, we have consistently held that jobs that are merely alike or comparable are not "substantially equal" for purposes of the EPA.

*Id.* (case citations omitted).

23

It is undisputed that during the period August 2017 through February 2018, Stinson and Alsip "carried out the same roles for different teams." Rule 30(b)(6) Dep. 32: 14-20. Charter contends that after Alsip's direct reports (managers Bynum and Serrano) were removed in February 2018, her position changed "materially" in that she no longer had supervision over and accountability for those managers. Alsip counters that she continued to perform the same work throughout 2018, except that she was no longer required to complete personnel paperwork (i.e., annual performance reviews) for Bynum and Serrano, which took approximately three-to-four hours per year. Moreover, Alsip attests that Charter held her accountable as a senior manager in January 2019 when only *she* was given a corrective action for an error made by a team of engineers managed by both Alsip and Serrano. Alsip 2d Decl. ¶ 6. Alsip's manager Fred Stoner, who became her manager following the incident, attests that Alsip was given a "coaching" (not a corrective action) for the error because it was her team of engineers who failed to have an audit in place by which they could track the error, not Serrano's team. Stoner Decl. ¶¶ 3-5. The Court concludes that only a jury may resolve the questions of whether Alsip's position changed "materially" in February 2018 and whether the action taken against Alsip in January 2019 demonstrates that Charter treated her as a senior manager.

Furthermore, the Court finds material factual issues with respect to Charter's affirmative defense. Charter "is correct that an individual's former salary can be considered in determining whether pay disparity is based on a factor other than sex. . . . However, the EPA precludes an employer from relying solely upon a prior salary to justify pay disparity." *Riser*, 776 F.3d at 1199 (internal quotation marks and citations omitted). Charter provides evidence that prior to Stinson's promotion, when he reported to Alsip, Stinson was paid a higher salary than Alsip. *Compare* Alsip salary information, ECF 48-4, *with* Stinson salary information, ECF 48-5. Charter concedes that

24

it must justify the pay disparity with *additional* evidence demonstrating a factor other than sex and argues that it has demonstrated "the difference in [Stinson's and Alsip's] levels of responsibility and accountability."  Reply at 12-13.  For the same reasons listed above, the Court finds genuine issues of material fact exist as to whether Stinson's and Alsip's skills, efforts, and responsibilities were substantially equal or substantially different under the prevailing law.  *See Riser*, 776 F.3d at 1196 ("[i]nsubstantial or minor differences in the degree or amount of skill, or effort, or responsibility required for the performance of jobs will not render the equal pay standard inapplicable") (citing 29 C.F.R. 1620.14).

## CONCLUSION

With respect to the Title VII retaliation claim, Alsip's proffered evidence would certainly support a verdict for her, but the evidence of record in its entirety does not <u>mandate</u> that result. Alsip has succeeded in demonstrating she is entitled to *Price Waterhouse*'s burden-shifting framework and Charter has raised a material factual issue as to whether it would have rescinded the May 2019 promotion offer absent concerns about this litigation.  Regarding the remaining claims, the Court finds genuine issues of material fact exist with respect to whether Charter's stated reasons for not promoting Alsip to a senior manager position in 2017-2018 are pretextual for Alsip's Title VII sex discrimination claim and whether Stinson's and Alsip's skills, efforts, and responsibilities were substantially equal or substantially different during the same time period for Alsip's EPA claim.

Accordingly, the Court **denies** Plaintiff's Motion for Partial Summary Judgment [<u>filed June 23, 2020; ECF 37</u>], which seeks a finding of liability against Charter for the Title VII retaliation claim, but finds that Plaintiff is entitled to a mixed-motive instruction at trial.  *See Fye,* 516 F.3d at 1227 (citing *Thomas*, 111 F.3d at 1512 for the proposition that "plaintiff was entitled to a mixed-

motive instruction when people involved in the promotion decision expressly stated that plaintiff would not be considered due to his discrimination complaint").   Likewise, the Court **denies** Defendants' Motion for Summary Judgment [filed July 1, 2020; ECF 38] and determines that a jury must decide the factual issues surrounding Alsip's claims for relief against Charter.

Dated at Denver, Colorado, this 31st day of August, 2020.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge